## MASARACCHIA v. INTER–CITY EXPRESS LINES, Inc., et al.

### No. 16068.

Court of Appeal of Louisiana. Orleans.
June 24, 1935.

H. M. Wilkinson, A. Miles Coe, F. W. Oser, G. M. Leppert, and W. H. Talbot, all of New Orleans, for appellants.

S. Weiss, L. H. Yarrut, and F. J. Stich, all of New Orleans, for appellee.

JANVIER, Judge.

This action ex delicto grows out of a collision between two motor vehicles which took place on the night of July 13, 1933, on the highway between Ponchatoula and Manchac, La. There were involved a large motortruck owned and driven by Cologero Masaracchia and an even larger tractor and trailer owned by defendant Inter-City Express Lines, Inc., and driven by one of its employees. The truck of Masaracchia, with an open top body used for transporting vegetables, fruit, and groceries, was on its way towards New Orleans, and the other combination vehicle, which we shall hereafter refer to as the milk truck because its large trailer was equipped with an enormous tank for carrying milk, was being driven north towards Ponchatoula.

Plaintiff seeks recovery in his own behalf and also for the use and benefit of his minor son, John, who was severely injured.

The defendants are the above-mentioned corporation, owner of the milk truck, and also Owners' Automobile Insurance Company of New Orleans, which, it is alleged, had issued a policy of liability insurance to the owner of the trailer and which within the terms and limits of the policy, is sought to be held liable, together with the main defendant.

Inter-City Express Lines, Inc., claiming that the accident resulted from the negligence of Masaracchia in many particulars set forth in the answer, denies any liability on its part and, by reconventional demand, seeks judgment for $463.92, alleging that to be the amount necessary to repair the damage to its truck and to provide a substitute while the repairs were being made.

The case was tried before a jury, which rendered a verdict in favor of plaintiff in his own behalf in the sum of $829.45, and for the use and benefit of his minor son in the sum of $7,000. The reconventional demand was dismissed. From a judgment based on the verdict, defendants have appealed.

The insurance company, among other contentions, makes the point that, though it concedes that it issued a policy of insurance, no policy is in the record and that there is no evidence to show the terms and conditions of such policy, and that, therefore, whatever the fault on the part of Inter-City Express Lines, Inc., no judgment should have been rendered against it, the insurer.

We shall not consider this question unless we shall first determine that there is liability in the main defendant.

As we view and interpret the pleadings of plaintiff on the main demand, his contention seems to be that, as he was driving carefully and slowly on the proper side of the road and with all necessary lights burning, he noticed defendant's milk truck coming towards him and moving back and forth across the center line of the roadway; that, becoming convinced that there was grave danger of an accident, he drove far to his right and, after actually leaving the paved or black top portion of the roadway, brought his truck to a complete stop with all four wheels on the shoulder; that while it was in this position, the other and larger vehicle, the milk truck, approaching at a very high speed, swerved across the road towards him, and, just before its front portion reached his truck, turned suddenly to its right; that though the front or tractor portion did not crash into his truck, the trailer or rear part struck and "sideswiped" his grocery truck and damaged it severely, at the same time fracturing his son's arm and so seriously injuring three fingers on his hand that subsequent amputation of the fingers became necessary.

Defendants' contention is that the milk truck, on its way towards Ponchatoula, was well over towards its right and was proceeding at a reasonable speed with all lights burning, when the smaller truck of plaintiff, approaching from the other direction, suddenly and without warning left its correct side of the road and crashed into the side of the trailer near its front and that plaintiff was negligent not only in the matter of speed and because of his crossing to the wrong side of the road, but because of the alleged fact that on his truck there were no lighted side or clearance lights such as are required by law on vehicles of extraordinary width.

There are many technical objections to evidence, to some of which we shall later refer after first directing our attention to the irreconcilable testimony concerning the main facts of the controversy.

It is interesting to note that each driver claims that just prior to the crash he had driven his vehicle to its right and had almost completely left the highway in order to avoid the other and that one claims to have completely and the other claims to have almost stopped. Manifestly one is in error.

Another irreconcilable dispute arises concerning the spot at which the collision occurred. After the impact, the milk truck came to a complete stop somewhere between 50 and 100 feet north of a 30-foot bridge over which it had just passed, and plaintiff's grocery truck came to rest about 30 or 40 feet south of the same bridge. Plaintiff contends that the vehicles met on the south side of the bridge and that, after the impact, the milk truck, because of its speed and momentum, continued across the bridge and did not stop until it had not only traversed the length of that structure, but had gone along for an additional 100 feet. Plaintiff also claims that his own truck was standing still when it was struck. He says "by the time I stopped the truck ran into me" and "when he hit me I was at a complete stop."

Defendants contend, on the contrary, that the collision took place north of the

bridge and after the milk truck had completely crossed it; that the said vehicle had practically stopped when it was crashed into by plaintiff's truck which, after the crash, proceeded entirely across the bridge and for an additional distance of some 30 or 40 feet, and that it then stopped in the middle of the road and not on the shoulder as plaintiff contends that it did.

We cannot reach any other conclusion than that the crash occurred on the south side of the bridge and on the west side of the road which was the side on which the milk truck should not have been. Numerically the witnesses who so testify predominate substantially, and when we carefully analyze all of the evidence we conclude that the weight of the evidence is also overwhelmingly to that effect.

Two disinterested persons, Dr. W. M. Miller of New Orleans and Mr. Charles Anzalone of Independence, La., reached the scene only a few moments after the impact and before either of the vehicles had been or could have been moved and both corroborate plaintiff's statement that his truck was far to its right and practically off the roadway on the shoulder. Such evidence clearly shows that testimony such as that given by two of defendants' witnesses was clearly erroneous. For instance, it is impossible that Pollard, a young man who was accompanying the driver of the milk truck to show him the way, could have been correct in his version that plaintiff's truck came to a stop "in the middle of the road."

That the crash occurred on the south side of the bridge seems also to be conclusively established, though defendants urge us to consider the fact that portions of the contents of the grocery truck were found after the collision on the bridge over which the said truck had just passed. The contention is that unless the crash had occurred before that truck reached the bridge no part of its contents would have been spilled upon the bridge. But the evidence shows that the impact between the two vehicles was terrific and that the iron rail alongside the tank of the milk trailer practically "sliced off" the wood side rail of the grocery truck. In view of the fact that we believe that the collision occurred south of the bridge, no other conclusion may be reached than that the iron rail of the milk truck knocked some of the contents of the grocery truck from the body of that truck and possibly hooked into some of them and carried them along with it and distributed them along the road and along the surface of the bridge.

The fact that after the crash Venable, who had been riding upon the milk trailer and who had been severely injured, was found on the road on the north side of the bridge is also pointed to as indicating that the two vehicles must have met on that side of the bridge. But it was not only possible, but even probable that when the crash occurred Venable did not immediately fall from the vehicle, but retained his position until, from weakness or from unconsciousness, he lost his hold and fell to the roadway. One of the other persons on the trailer so testified.

Defendant also shows that a lavatory set, which was on the trailer as a part of its freight, was found later on the north side of the bridge. It is entirely possible that the lavatory set remained in its position on the trailer until after the crash and that it was jolted to the ground only after the milk truck had crossed the bridge.

On these main questions, as we have said, the evidence of plaintiff substantially predominates both in number of witnesses and in weight. In fact, as to the actual occurrence of the accident, defendants are forced to rely almost entirely on the testimony of Gonzales, the driver of their truck, and he is shown to have been manifestly in error in the two important details to which we have referred and also in less important matters. His testimony on these minor questions, though of no importance in itself, nevertheless, assists in determining whether on the more important points he is entitled to credence. He states that Venable, who had been riding on the milk trailer, was on the right side of the trailer and not on the left side. This is one point on which there is no room for doubt. All of the other witnesses agreed that Venable was on the left side, and, in fact, had he been on the right side he would not have been injured. Gonzalez also states that the two other companions of Venable did not go to Ponchatoula on the trailer after the accident, though it is conclusively shown that these other parties did ride to Ponchatoula on this trailer. In spite of this, Gonzales testified that when he reached Ponchatoula he found them there and held a conversation with them concerning the fact that they had reached there before he did.

One physical fact has given us much concern. No part of the front of the tractor which was pulling the milk trailer and no part of the left front fender thereof came into contact with plaintiff's truck. The testimony of experts is, and there can be no doubt that in this they are correct, that when a vehicle makes a turn either to the right or to the left, unless the rear portion is wider than the front portion or unless the rear portion slips or skids across the roadway, the arc described by the rear wheels cannot be outside the arc previously described by the front wheels. It is argued from this that the accident could not have occurred as plaintiff contends that it did for the reason that had such an occurrence taken place the front part of the Inter-City Express Company's tractor would necessarily have struck plaintiff's truck or the rear part could not have done so. The physical fact that the rear portion of a vehicle which is making a turn cannot, unless it skids or unless it is wider than the front, describe an arc outside that described by the front portion is obvious, but here the facts show that although the trailer was no wider than the tractor which was pulling it, the entire vehicle was proceeding at a terrific speed and, because of unevenness in the surface of the road, its rear portion was moving to some extent back and forth across the road. There is much evidence tending to show that a two-wheel trailer, which is sometimes known as a semitrailer, is safer than a four-wheel trailer because it will not skid, but the evidence of the experts, Mr. deColigny and the others, shows that if a vehicle, such as that with which we are concerned, is pulled by a tractor at a very high speed and the tractor suddenly turns to one side or the other or if its speed is suddenly retarded, the trailing vehicle may skid. Mr. deColigny testified that under such circumstances "it is possible to get a whipping motion in the trailer." He also stated that under such circumstances "any skids of any kind always occur in the opposite direction from which you turn your front wheels in a car. The rear end tends, as near as it can, to go in the direction it was going. If it can't go that way, it tends to make a swing to the left." Later he was asked a question which, though hypothetical, appears to us to include all of the facts which from the record we believe existed in this case. That question follows:

"If the tractor and semi-trailer were going at a considerable speed, say over 35 miles an hour, and the tractor of the type on the picture in your hand were turned suddenly to the right, would it be impossible for the rear wheels of that semi-trailer to go more to the left than the rear wheels of the tractor had gone in describing that arc?"

His answer was:

"If the tractor operator, after making the turn, put his brakes on, if the roads were slippery and the condition of the tires was such that the non-skid part of the tread, which tends to hold the thing, give it a tractive effort, you might say, or give it adhesion to the road, were smooth, it is not impossible."

The evidence convinces us that the milk truck was proceeding at a speed of about 40 miles per hour just before the impact. All of the witnesses agree to a speed in excess of 35 miles and some give a figure as high as 50. It is shown that the said truck was equipped with a governor and that this governor had, some years previously, been set at 35 miles per hour and, though the testimony of the experts to the effect that the governor would not get out of order and would prevent a speed greater than 35 miles per hour is most convincing, we, nevertheless, believe that the record shows that the speed was somewhat over that and that because of this and as a result of the sudden turn to the right the rear portion of the larger vehicle skidded or slipped slightly to the left and crashed into and along the side of plaintiff's truck.

Defendants seek to show that plaintiff's allegations differ to some extent from the proof and they maintain that for this reason much of the evidence should have been excluded. They declare that in the pleadings it is asserted that at the time of the crash the truck was completely off the road, whereas some of the witnesses stated that although most of the truck was off the road its left rear wheels remained on the edge of the black top or paved portion. There is no substantial difference between the allegations and the proof in this regard and we believe that the evidence was properly admitted.

Objection is also made to the evidence on behalf of plaintiff tending to show that the crash occurred south of the bridge because, so it is argued, the various peti-

tions, original and supplemental, must be interpreted as charging that it took place on the north side. The allegations with reference to the location of the trucks at the time of the crash are, it is true, somewhat confusing, but we find that, construing them all together, they charge that plaintiff saw the milk truck while he was yet on the north side of the bridge and that he continued across the bridge and did not realize until he was on the south side that the crash was imminent.

■ Defendant contends that plaintiff was contributorily negligent because of the alleged fact that, at the time of the accident, the "clearance" lights on the left side of his truck were not burning. Our attention is directed to section 9 (g), par. 5, of Act No. 21 of 1932, which requires that any vehicle "having a width at any part in excess of seventy (70) inches, and a length exceeding fifteen (15) feet, shall carry two clearance lamps on the left side of such vehicle," etc. It is charged that plaintiff's vehicle was not equipped in compliance with the above-quoted portion of that statute. We believe that the evidence shows that, at least, the rear clearance light was burning at the time though there is much room for doubt on this point. It is true that Mr. Jacquet, an adjuster of the defendant insurer, examined the truck some time after the accident and testified that he found a spider web where the bulb should have been and, it is argued from this, that there could not have been a bulb in the light at the time of the accident. Spider webs are formed very quickly and, within the few days which intervened between the accident and Mr. Jacquet's examination, it is possible that the spider web was placed there by some such industrious insect. It is true that no bulb was found within the light and this throws considerable doubt on the testimony that the light was burning; nevertheless, viewing the evidence as a whole, we conclude, as we have stated, that at least the rear light was burning at the time of the accident. But whether it was burning or not the absence of the light, if there was no such light, in view of the contention made by defendants, had no causal connection with the accident. Defendants contend that the milk truck did not run into the grocery truck, but that the milk truck was far to its right side of the road and had practically stopped when the grocery truck ran into it. If, as a matter of fact, the driver

of the milk truck had been confused by the absence of clearance lights on the grocery truck, and had attempted to turn to that side of the road and had suddenly found in front of him the unlighted rear end of the grocery truck, then manifestly the absence of clearance lights could be said to have had causal connection with the accident, but that is not the contention and, therefore, we conclude that even if the clearance lights were not burning the negligence of Masaracchia in this regard had nothing to do with the ultimate accident.

We find in the record a voluminous document containing charges which defendant requested that the trial judge give to the jury, but we find no detailed discussion of these charges in the record and, having read the proposed charges which were submitted and the charges which were given, we conclude that there was no reversible error in the failure of the trial judge to give the proposed charges.

■ We next consider the contention that there is in the record no proof of the existence of the insurance policy or of its terms, limits, and conditions. We find in plaintiff's original petition the charge:

"That the Owners Automobile Insurance Company is a corporation organized under the laws of the State of Louisiana, domiciled and doing business in the City of New Orleans, and is the insurer of the Inter-City Express Lines, Inc."

We further find that in answer to this allegation both defendants admitted "the corporate status of the Owners' Automobile Insurance Company of New Orleans," and further admitted "that said Insurance Company did issue an insurance policy to said Inter-City Express Lines, Inc., which policy is the best evidence of its provisions." It is true that we find in the record no other proof of the existence of the policy or of its terms, limits, and conditions, but we conclude that, having admitted that it had issued such a policy, the burden of proof was on the insurer to show the terms, limits, and conditions thereof and to prove that there was no liability under it under the circumstances of this case or to prove the extent to which it might be held liable.

We concede that in our original opinion in Lapeze v. O'Keefe, 158 So. 36, 37, we said:

"Neither the policy nor a copy thereof was introduced and filed in evi-

dence; consequently we are in ignorance of the terms of the policy and without sufficient evidence upon which to render a judgment against the defendant casualty companies."

Having given the matter further thought, we conclude that where, in a suit against a main defendant and also against the main defendant's insurer, the insurer admits that it has issued a policy, it is a fair assumption, in the absence of allegations and proof to the contrary, that the policy limits are coextensive with the liability which, in the petition, is averred to exist, and that if it is not so coextensive, the insurer will so allege and will submit proof in support of its allegations.

The right to include the insurer as a defendant in a matter of this kind is given by Act No. 55 of 1930 which is amendatory of Act No. 253 of 1918, and we believe that construing these acts together and bearing in mind the fact that the main defendant and the insurer both have full knowledge of the terms and conditions of any such policy, whereas the plaintiff can have no such knowledge, the burden of proof should be placed upon the defendants, who have admitted the existence of the policy, to show that the terms of the policy are such as to exclude the company from liability or are such as to limit its liability to some particular amount. In the absence of such proof, it should be held that the liability of the insurer is coextensive with that of the insured.

A consideration of the evidence with reference to the seriousness of the injuries to the young son of the plaintiff and also of the evidence concerning the expenses to which plaintiff, himself, was put, leads us to the conclusion that there must be a reduction in the amount of the judgment.

For repairs to his truck, plaintiff claimed and was awarded $234.62, and a careful examination of the items of damage leads us to the view that there are included in this amount minor charges for repairs which were not made necessary by the accident. We also find a charge for two new tires and tubes, though the evidence leads to the conclusion that, at the time of the accident, the tires and tubes had seen considerable service. We further find that the evidence with reference to the necessity of the expenditure of $75 for the hire of another vehicle while the repairs were being made is not entirely satisfactory. It is very evident that the repairs were much delayed and we feel that this item would have been much reduced had plaintiff attended to his repairs with promptness. The amounts expended for ambulance services, doctor's bills, etc., are satisfactorily established. We have concluded that the amount awarded to plaintiff on his own behalf should be reduced by $150, making the net amount to which he, himself, is entitled $679.45.

The injuries to his minor son were quite serious. The amputation of the first, third, and fourth fingers of his left hand was rendered necessary and the left forearm was badly fractured, but we find that the injuries have healed so far as is possible and we believe that the record shows that he will not sustain damage equivalent to the total loss of his arm or of his hand.

In Rossey v. Lawrence & Hamilton, 123 La. 1053, 1054, 49 So. 704, 706, 17 Ann. Cas. 484, the Supreme Court held that an award of $2,500 in favor of a minor was reasonable. There the court said:

"While the hand was not destroyed, the total loss of the thumb and forefinger and the partial loss of two other fingers render it almost useless for practical purposes."

In Lapeze v. O'Keefe, supra, we concluded that $6,500 was a reasonable amount for the amputation of a right arm where there were three operations and where there had been permanent disfigurement.

Counsel for plaintiff cites McDonald v. Stellwagan (La. App.) 140 So. 133, in which an award of $7,000 was increased to $10,000 and in which a fourteen year old boy sustained a broken leg, a crushed ankle and foot which resulted in the shortening of his leg.

There is no adequate yardstick by which we can measure such damages and fix with any reasonable consistency the amounts which should be awarded.

Viewing the injuries which this young boy sustained and taking into consideration the various cases cited and others which we find in our jurisprudence, we conclude that the amount awarded is excessive by the sum of $2,000.

It is, therefore, ordered, adjudged, and decreed that the judgment appealed from be and it is amended by reducing the amount thereof in favor of plaintiff in his own behalf to $679.45, and by reducing the amount awarded for the use and benefit of

his minor child, John Masaracchia, to $5,000, and that, as thus amended, the judgment be and it is affirmed; plaintiff-appellee to pay costs of appeal, all other costs to be paid by defendants-appellants.

Amended and affirmed.